# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF NEW YORK

_____

Nº 06-CV-5576 (JFB) (WDW)
_____

KEVIN BRADY

Plaintiff,

VERSUS

COUNTY OF SUFFOLK, RICHARD DORMER, HENRY MULLIGAN, THOMAS PALMIERI, AND MICHAEL MURPHY, IN THEIR INDIVIDUAL AND OFFICIAL CAPACITIES,

Defendants.

_____

**MEMORANDUM AND ORDER**
September 18, 2009
_____

JOSEPH F. BIANCO, District Judge:

On October 16, 2006, plaintiff Kevin Brady ("plaintiff" or "Brady") brought this action against defendants Richard Dormer ("Dormer"), Henry Mulligan ("Mulligan"), Thomas Palmieri ("Palmieri"), and Michael Murphy ("Murphy"), individually and in their official capacities as employees of the Suffolk County Police Department (collectively, the "individual defendants"), as well as the County of Suffolk ("the County") (collectively, "defendants"), alleging that defendants violated plaintiff's rights under the First and Fourteenth Amendments of the United States Constitution, pursuant to 42 U.S.C. §§ 1981, 1983 ("Section 1983"), as well as under the New York State Human Rights Law and New York City Human Rights Law.

The only remaining claim in this case is the Section 1983 claim for retaliation in violation of plaintiffs' First Amendment rights.[1] Specifically, plaintiff, who is a Suffolk County police officer, claims that he was transferred to a two-tour schedule in retaliation for his First Amendment speech relating to his complaints about defendants' alleged practice of not issuing tickets for

_____

[1] In his opposition papers, plaintiff withdrew his Section 1983 claims based upon his rights to equal protection pursuant to the Fourteenth Amendment. At oral argument, plaintiff further conceded that he is no longer pursuing any claims under 42 U.S.C. § 1981 or any of the state law or New York City law claims. Accordingly, all claims other than plaintiff's Section 1983 claim based on his First Amendment right to protected speech are deemed withdrawn and/or abandoned and are thus dismissed.

traffic violations to off-duty law enforcement officials and individuals in possession of Suffolk County Police Benevolent Association ("PBA") membership cards. Defendants now move for summary judgment pursuant to Rule 56(c) of the Federal Rules of Civil Procedure on various grounds.

For the reasons set forth below, defendants' motion is granted with respect to plaintiff's Section 1983 claim for retaliation in violation of his First Amendment rights. In particular, even if plaintiff's internal statements to supervisors (such as a 2004 memorandum to the Police Commissioner) – which criticized the alleged practice of not ticketing off-duty law enforcement officials and PBA cardholders – involve a matter of public safety, the claim fails as a matter of law because the undisputed facts demonstrate that the statements were not made as a citizen (but rather pursuant to a public employee's official duties) and, thus, cannot give rise to a First Amendment retaliation claim under well-settled Supreme Court and Second Circuit law. The undisputed facts include, among others, the following: (1) the speech related to plaintiff's core job function of the enforcement of the traffic laws through the issuance of summonses; (2) the statements at issue were made in internal meetings with supervisors and in an internal memorandum to the Police Commissioner; (3) the speech was made on work premises during work hours, and the memorandum was written on a standard internal correspondence form, with reference to a department-wide email; (4) the speech related to plaintiff's ticketing practices and reflected his special knowledge of the situation that he gained as a Highway Patrol officer; and (5) the speech was made in response to threatened discipline and a dispute over the performance of plaintiff's official duties. In any event, even assuming that the 2004 memorandum was actionable First Amendment speech, the retaliation claim still fails to survive summary judgment because of the lack of any evidence of causation. Specifically, over two years passed between the 2004 memorandum and the recommendation for plaintiff's transfer in June 2006, and the uncontroverted evidence demonstrates that the transfer in June 2006 resulted from a series of events that took place in January 2006 in response to an e-mail written by plaintiff, which also contained no speech by plaintiff as a citizen.

## I. FACTS

The Court has taken the facts set forth below from the parties' depositions, affidavits, and exhibits, and from the parties' respective Rule 56.1 statements of facts. Upon consideration of a motion for summary judgment, the Court shall construe the facts in the light most favorable to the non-moving party. *See Capobianco v. City of New York*, 422 F.3d 47, 50 (2d Cir. 2001). Unless otherwise noted, where a party's 56.1 statement is cited, that fact is undisputed or the opposing party has pointed to no evidence in the record to contradict it.

Plaintiff was, at all times relevant to this lawsuit, a Suffolk County police officer assigned to the Highway Patrol Bureau, who was tasked with enforcing New York State's Vehicle and Traffic Law ("VTL") by issuing traffic citations to those who violated the VTL and arresting those who drive while intoxicated ("DWI"). (Defendants' ("Defs.'") 56.1 ¶ 1; Brady Dep., at 11.)

Police officers of the Suffolk County Police Department ("SCPD") are represented by a law enforcement association known as the Suffolk County Police Benevolent

Association. (Defs.' 56.1 ¶ 2.) The PBA issues membership cards ("PBA cards") on an annual basis, and police officers and other law enforcement officials who are PBA members distribute those PBA cards to persons of their choosing, typically their family and friends. (Defs.' 56.1 ¶ 3.)

Plaintiff believes that PBA cards are primarily used to "get somebody off a traffic violation without getting a ticket." (Defs.' 56.1 ¶ 4; Brady Dep., at 16.) Plaintiff has witnessed other police officers decline to ticket a PBA cardholder "very frequently." (Defs.' 56.1 ¶ 5; Brady Dep., at 17.) Plaintiff himself has not written tickets to those who present a PBA card to him at traffic stops "a lot." (Defs.' 56.1 ¶ 5; Brady Dep., at 18.) Plaintiff claims that he was pressured by supervisors and other members of the County to not give tickets to those who carry PBA cards. (Pl.'s 56.1 ¶ 5.) Plaintiff alleges that the SCPD ignored an Order of the County Executive, issued on January 29, 2004, which prohibited County employees from displaying any law enforcement association membership card for the purpose of securing preferential treatment or waiver from law enforcement. (Brady Dep., at 31; *see* Pl.'s Opposition, Ex. 1.)

According to plaintiff, on February 10, 2004, plaintiff observed an unmarked car driving eighty-three miles per hour in a fifty-five mile per hour zone. (Defs.' 56.1 ¶ 11.) Plaintiff pulled over the vehicle and identified the driver as Customs Agent Calvin A. Webb ("Webb"). (Defs.' 56.1 ¶ 10.) Plaintiff gave Webb a warning about his excessive speed. (Defs.' 56.1 ¶ 11.) Thereafter, Webb left the scene at over one-hundred and two miles per hour, and Brady again stopped him and issued him a traffic ticket. (Defs.' 56.1 ¶ 12.) Webb then filed a complaint against plaintiff with

the SCPD, alleging that Brady was unprofessional and demeaning during their encounter. (Defs.' 56.1 ¶ 13.)

Following the issuance of the ticket to Webb, Brady was called into a meeting on May 19, 2004 with Deputy Inspector Blaettler ("Blaettler") and Lieutenant Palmieri ("Palmieri"). (Defs.' 56.1 ¶ 14.) Plaintiff was not advised that this meeting would be disciplinary in nature. (Pl.'s 56.1 ¶ 15.) Although Blaettler and Palmieri indicated at that meeting that there were numerous complaints made against plaintiff by off-duty law enforcement officials and PBA cardholders, plaintiff was only given the specifics of one complaint, which was made by Webb. (Pl.'s 56.1 ¶ 15.) Plaintiff stated during the meeting that some of the traffic violations that he encountered were so egregious that he was personally offended by the way some motorists drove, that he was frustrated by arguments and excuses made by such motorists, including off-duty law enforcement personnel and persons in possession of PBA cards, and that he had told a few motorists that he was putting their names in a computer system so that if they were subsequently stopped, they would receive a summons. (Defs.' 56.1 ¶ 17.) Plaintiff also expressed his belief that the pubic's safety was at risk due to "the fact that there are so many individuals who believe that they are immune to being ticketed or arrested for any traffic offense they commit." (Decl. of Christopher M. Gatto, Esq. ("Gatto Decl."), Ex. C.)

During this meeting, Palmieri and Blaettler specifically told plaintiff to "use [his] discretion" when issuing tickets. (Defs.' 56.1 ¶ 14.) When plaintiff asked for further guidance as to when or at what level he should use his discretion, he was not

instructed as to a proper speed to start or stop issuing tickets. (Brady Dep., at 21.) His supervisors also advised him to maintain a calm and professional interaction with motorists at all times, discontinue the use of threatening and berating language, and refrain from communications about a non-existent computer system. (Defs.' 56.1 ¶¶ 17-18.) He was further told that, if he encountered an irate motorist or other difficult situation, he should request that a supervisor respond. (Defs.' 56.1 ¶ 18.) Plaintiff claims, however, that "it was made clear to him at that meeting that he was to give people breaks on traffic infractions if they are associated with the police department, other county departments, or possess a PBA card, no matter what the violation." (Pl.'s 56.1 ¶ 14.)

No disciplinary action was taken against plaintiff as a result of this meeting, although he was told that if his unacceptable behavior continued, he might be transferred to the two-tour schedule in order to provide him with additional supervision. (Defs.' 56.1 ¶¶ 16, 18.) Plaintiff claims that he was threatened with discipline, including the transfer to a two-tour schedule, only after he engaged in protected speech at the meeting. (Pl.'s 56.1 ¶ 18; Brady Aff. ¶ 5.) Plaintiff further claims that this threat of discipline occurred when, at the time, plaintiff had one of the best arrest and attendance records and was one of the highest issuers of speeding tickets in the County. (Pl.'s 56.1 ¶ 16.)

In an "[SCPD] Internal Correspondence" memorandum written by plaintiff dated May 19, 2004, which was addressed and mailed to Commissioner Dormer, plaintiff referred to the meeting he had that same day with Blaettler and Palmieri. (Defs.' 56.1 ¶ 21.) He stated that, as a result of the meeting and the complaints lodged against him about his verbal warnings while ticketing individuals with PBA cards, he was "facing a possible disciplinary transfer[.]" (Gatto Decl., Ex. C.) At the close of the correspondence, plaintiff requested that, "[a]s a solution[,]" a video camera be installed in his police car so that his actions could be videotaped to "vindicate [his] enforcement actions and have any future complaint filed against [him] shown to be without merit."[2] (Gatto Decl., Ex. C; Defs.'

---

[2] The full contents of the letter is as follows:

> I have been a Suffolk County Police Officer for over ten years and have been the Top DWI Cop of the Year in two different commands, Cop of the Month multiple times, never had any disciplinary action taken against me and have only called in sick once my whole career due to a gallbladder operation. This morning I had a meeting with Hwy Patrol Commanding Officer Deputy Inspector Blaettler and Executive Officer Captain Palmieri and I now find myself facing a possible disciplinary transfer to two tour due to a situation that can only be described as incredulous. Apparently, the Hwy Patrol office has received calls from Law Enforcement Officials complaining about the nature of my verbal warnings after I had stopped them and the issuing of tickets to individuals with PBA cards.
>
> As I pointed out during our meeting, I believe the situation on the roadways of Suffolk County is quite frankly out of control and the public's safety is at risk due to the fact that there

are so many individuals who believe that they are immune to being ticketed or arrested for any traffic offense they commit. This includes Law Enforcement Officials, State and Federal Government officials, and individuals with PBA cards to name, but a few. I routinely pull over hundreds of these individuals every year and now instead of the Police Department finding a way to curtail their egregious behavior, I am being instructed to verbally warn them in such a manner that they do not feel threatened with any enforcement action no matter how fast or reckless they were driving. I routinely risk my life driving at high speeds to stop these individuals and to have the Police Department attempt to cite my behavior, as being something less than professional is a slap in the face. I firmly believe that the law applies to everyone and that clearly it is not being enforced evenly on the roadways of Suffolk County and that any Police Officer who attempts to do so will find themselves in my situation – facing a transfer without proper cause. You recently sent out a department wide e-mail stating you would support any Police Officer who does his sworn duty in exactly this type of situation so why am I being threatened with a transfer?

As a solution, I would like to formally request that one of the new digital video cameras that are available for installation in Hwy Patrol vehicles, be installed in the new 913A vehicle when it

56.1 ¶ 21.) Plaintiff argues that this memorandum expressed a concern for the safety of the public as a result of the enforcement policies of the County and was not sent in the course of his job duties and responsibilities. (Pl.'s 56.1 ¶ 21.) With respect to the memorandum, plaintiff never spoke to Commissioner Dormer or received anything in writing as a response from him. (Defs.' 56.1 ¶ 21.) The Deputy Commissioner called plaintiff sometime thereafter, but they "never really got into any specifics about what was going to be done" about his request to have a camera installed in his police car. (Brady Dep., at 51-52; Defs.' 56.1 ¶ 21.)

Some time after he expressed his views on ticketing individuals with PBA cards, plaintiff found cut up PBA cards in his mailbox at work. (Brady Aff. ¶ 7.) He reported the incident to Mike Applequist, a union official, who, according to plaintiff, then expressed to plaintiff that plaintiff had no friends within the SCPD as a result of his enforcement practices. (Brady Aff. ¶ 7.)

In late May 2004, Lieutenant Murphy met with Brady and his immediate supervisors, Sergeant Vincent Urwand and Sergeant Ronald Strain. (Defs.' 56.1 ¶ 19.) The allegations made by Webb against plaintiff were found to be unsubstantiated by Murphy, who investigated the incident. (Defs.' 56.1 ¶¶ 13, 19.) At this meeting, Murphy told plaintiff that he should be professional when conducting car stops and that he should use

comes into service. This will totally vindicate my enforcement actions and have any future complaint filed against me shown to be without merit.

(Gatto Decl., Ex. C.)

his discretion and decide who, if anybody, should be given warnings. (Defs.' 56.1 ¶ 20.) Plaintiff claims that Murphy's emphasis on plaintiff's need to be "professional" was "aimed solely at dealings with off-duty law enforcement officials, or PBA card holders, and he did not raise [p]laintiff's dealings with the public as an issue." (Pl.'s 56.1 ¶ 19.) The request to be "professional" was, according to plaintiff, defendants' way of indicating to plaintiff that he was to abstain from issuing tickets to law enforcement officials or PBA cardholders. (Pl.'s 56.1 ¶ 19.)

Murphy had three or four counseling sessions with Brady about his behavior during car stops. (Defs.' 56.1 ¶ 22.) Murphy kept a record of counseling sessions conducted with plaintiff, as well as a complaint from a retired NYPD officer regarding plaintiff's alleged unprofessional comments to the retired officer's daughter and plaintiff's conduct during that arrest. (Murphy Decl. ¶ 5.) Murphy has no knowledge, however, of any off-duty officer making a complaint against plaintiff. (Defs.' 56.1 ¶ 22; Murphy Decl. ¶ 5.)

On January 12, 2006, Deputy Inspector Mulligan, Captain Palmieri, and Lieutenant Murphy met with plaintiff, in response to an e-mail plaintiff had written in December 2005, requesting, *inter alia*, direction on how to respond to potential threats by PBA cardholders and off-duty personnel at car stops.[3] (Defs.' 56.1 ¶ 23; Gatto Decl., Ex. B1.) During the meeting, plaintiff stated that any motorist traveling over eighty-five miles per hour was dangerous and deserved a summons, and so discretion in most of those

situations was eliminated. (Defs.' 56.1 ¶ 26; Brady Dep., at 62.) Plaintiff expressed "concern for the safety of the public if there is no cut-off at which point no one, including off-duty officers or individuals with PBA cards, avoided receiving a ticket." (Brady Aff. ¶ 8.) Again, plaintiff was advised to use discretion as to when to take enforcement action in conformance with SCPD protocol and applicable laws and to maintain a calm and professional demeanor when communicating with motorists. (Gatto Decl., Ex. B1.) Although Palmieri, in an internal correspondence memorandum dated January 12, 2006, wrote that Brady was advised that "[t]here is no special dispensation for police officers or citizens producing PBA Cards[,]" (Gatto Decl., Ex. B1), plaintiff argues that his supervisors' statements were "designed to indicate to [p]laintiff that he should let those individuals go[.]" (Pl.'s 56.1 ¶ 27.)

After the January 12, 2006 meeting, Mulligan directed Palmieri to monitor plaintiff's summonses to see if Brady was obeying his directive. (Defs.' 56.1 ¶ 28.) According to internal correspondence from Palmieri to Urwand dated March 29, 2006, Palmieri directed Sergeant Clancy to discuss with plaintiff his practice of focusing his ticketing on only those who speed in excess of eighty-five miles per hour. (Gatto Decl., Ex. C1.) As a follow-up measure, Palmieri also obtained copies of the traffic summonses issued by plaintiff during the month of March 2006. (Defs.' 56.1 ¶ 28.) Of the twenty-two summonses that had been issued, nineteen were for speeds in excess of eighty-five miles per hour, and three were written for speeds less than eighty-five miles per hour. (Defs.' 56.1 ¶ 28.) Consequently, Palmieri directed Sergeant Urwand to discuss with Brady what Palmieri deemed plaintiff's "sub-standard and unacceptable work performance." (Defs.'

---

[3] There is no dispute that the December 2005 e-mail by plaintiff was written pursuant to his job duties. (Defs.' 56.1 ¶ 23.)

56.1 ¶ 28.)

In a counseling session on March 30, 2006, Urwand advised plaintiff that the number of summonses for speeds in excess of eighty-five miles per hour should be proportionate to the number of speeds below eighty-five miles per hour. (Defs.' 56.1 ¶ 29.) In the comments section of the Counseling Session Form signed by plaintiff, plaintiff wrote, "I understand I am being ordered to write 50% of my speeding tickets under 85 mph. I intend to comply with this order." (Gatto Decl., Ex. D1.)

On March 30, 2006, after reviewing plaintiff's statement in the Counseling Session Form, Palmieri directed Urwand to have another counseling session during which plaintiff should be advised that the number of speeding tickets issued is not predetermined, and, thus, plaintiff was not being directed to issue summonses at a rate of 50% under eighty-five miles per hour and 50% over eight-five miles per hour. (Defs.' 56.1 ¶ 30; Gatto Decl., Ex. E1.) Palmieri continued to monitor plaintiff's performance with respect to his speed enforcement. He compared plaintiff's record of summonses with those of two other officers in the Highway Patrol Bureau for the time period beginning February 17, 2006 and ending June 16, 2006. (Defs.' 56.1 ¶ 33.) During that period, Brady issued twenty-one summonses for violations under eighty-five miles per hour, while the other officers issued forty-eight and eighty-three summonses, respectively. As for violations involving speeds greater than eighty-five miles per hour, plaintiff had issued sixty summonses, while the other two officers had issued thirty-three summonses each. (Defs.' 56.1 ¶ 33.)

In June 2006, plaintiff pulled over a widow of a deceased Suffolk County police detective and gave her a ticket. (Defs.' 56.1 ¶ 35.) Thereafter, the widow's son asked plaintiff if he was going to turn in the ticket, which was turned in by plaintiff. (Defs.' 56.1 ¶ 35.)

Plaintiff was transferred to a two-tour schedule in a precinct, effective July 2006. (Defs.' 56.1 ¶ 37; Brady Dep., at 85.) This transfer was recommended by Palmieri on June 28, 2006 and agreed upon by Mulligan. (Defs.' 56.1 ¶ 36; Gatto Decl., Ex. F1.) Plaintiff alleges that this transfer, purportedly on the basis of his job performance, was actually in retaliation for his engagement in protected speech. (Pl.'s 56.1 ¶ 36.) As a result of the transfer, plaintiff claims that he has lost night differential pay, as well as overtime opportunities within the Highway Patrol Bureau, and must work in a precinct further away from his home. (Brady Dep., at 85.)

## II. PROCEDURAL HISTORY

Brady filed the complaint in this action on October 16, 2006. Defendants answered the complaint on December 29, 2006. This case was administratively closed on February 16, 2007, when plaintiff was deployed to Iraq with the National Guard, and was reopened on September 10, 2007. On November 14, 2008, defendants submitted their motion for summary judgment. Plaintiff submitted his opposition on January 9, 2009. Defendants submitted their reply on January 30, 2009. The Court held oral argument on May 28, 2009, and has fully considered the submissions of the parties.

## III. STANDARD OF REVIEW

The standards for summary judgment are

well settled. Pursuant to Federal Rule of Civil Procedure 56(c), a court may not grant a motion for summary judgment unless "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c); *Globecon Group, LLC v. Hartford Fire Ins. Co.*, 434 F.3d 165, 170 (2d Cir. 2006). The moving party bears the burden of showing that he or she is entitled to summary judgment. *See Huminski v. Corsones*, 396 F.3d 53, 69 (2d Cir. 2005). The court "is not to weigh the evidence but is instead required to view the evidence in the light most favorable to the party opposing summary judgment, to draw all reasonable inferences in favor of that party, and to eschew credibility assessments." *Amnesty Am. v. Town of W. Hartford*, 361 F.3d 113, 122 (2d Cir. 2004); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) (summary judgment is unwarranted if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party").

Once the moving party has met its burden, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts . . . . [T]he nonmoving party must come forward with specific facts showing that there is a *genuine issue for trial*." *Caldarola v. Calabrese,* 298 F.3d 156, 160 (2d Cir. 2002) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986)) (emphasis in original). As the Supreme Court stated in *Anderson*, "[i]f the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." 477 U.S. at 249-50 (citations omitted). Indeed, "the mere existence of *some* alleged factual dispute

between the parties" alone will not defeat a properly supported motion for summary judgment. *Id.* at 247-48 (emphasis in original). Thus, the nonmoving party may not rest upon mere conclusory allegations or denials, but must set forth "concrete particulars" showing that a trial is needed. *R.G. Group, Inc. v. Horn & Hardart Co.*, 751 F.2d 69, 77 (2d Cir. 1984) (internal quotations omitted). Accordingly, it is insufficient for a party opposing summary judgment "merely to assert a conclusion without supplying supporting arguments or facts." *BellSouth Telecommc'ns, Inc. v. W.R. Grace & Co.*, 77 F.3d 603, 615 (2d Cir. 1996) (internal quotations omitted).

## IV. DISCUSSION

As stated *supra*, plaintiff brings his claim of retaliation pursuant to Section 1983. Section 1983 "is not itself a source of substantive rights, but a method for vindicating federal rights elsewhere conferred by those parts of the United States Constitution and federal statutes that it describes." *Baker v. McCollan*, 443 U.S. 137, 145 n.3 (1979).[4]  For claims under Section

---

[4] Specifically, Section 1983 provides:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law . . . .

1983, a plaintiff must prove that "(1) the challenged conduct was attributable at least in part to a person who was acting under color of state law and (2) the conduct deprived the plaintiff of a right guaranteed under the Constitution of the United States." *Snider v. Dylag*, 188 F.3d 51, 53 (2d Cir. 1999) (citation omitted).

Here, the parties do not dispute that defendants were acting under color of state law. The question presented, therefore, is whether defendants' conduct deprived Brady of the rights he asserts under the First Amendment. Specifically, plaintiff claims that he was retaliated against for (1) his statements during a meeting with his supervisors on May 19, 2004 ("the May 2004 meeting"), (2) his memorandum to Commissioner Dormer dated May 19, 2004 ("the May 2004 memorandum"), and (3) his statements during a meeting with his supervisors on January 12, 2006 ("the January 2006 meeting").

The Second Circuit has "described the elements of a First Amendment retaliation claim in several ways, depending on the factual context." *Williams v. Town of Greenburgh*, No. 06 Civ. 4897, 2008 U.S. App. LEXIS 15403, at *10 (2d Cir. July 22, 2008). Where, as here, a public employee brings a retaliation claim based on the First Amendment, a plaintiff must put forth evidence that demonstrates the following in order to establish a *prima facie* case: "(1) [he] engaged in constitutionally protected speech because [he] spoke as [a] citizen[] on a matter of public concern; (2) [he] suffered an adverse employment action; and (3) the speech was a 'motivating factor' in the adverse employment

---

42 U.S.C. § 1983.

decision." *Skehan v. Village of Mamaroneck*, 465 F.3d 96, 106 (2d Cir. 2006), *overruled on other grounds by Appel v. Spiridon*, 531 F.3d 138, 140 (2d Cir. 2008). However, defendants may still "escape liability if they can demonstrate that either (1) the defendant would have taken the same adverse action against the plaintiff regardless of the plaintiff's speech; or (2) the plaintiff's expression was likely to disrupt the government's activities and that the harm caused by the disruption outweighs the value of the plaintiff's expression." *Id.* The latter is known as the "*Pickering* balancing test" and is a question of law for the Court. *See Cobb v. Pozzi*, 363 F.3d 89, 102 (2d Cir. 2004) (referring to *Pickering v. Bd. of Educ.*, 391 U.S. 563, 568 (1968)). Even if the government prevails on the *Pickering* test, plaintiff may still succeed by showing that the adverse action was in fact motivated by retaliation and not by any fear of a resultant disruption. *See Reuland v. Hynes*, 460 F.3d 409, 415 (2d Cir. 2006).

Defendants contend that there is no genuine issue of material fact as to the following elements of plaintiff's claim: whether plaintiff spoke as a citizen; whether the speech involved a matter of public concern; and whether a causal connection exists between the speech and an adverse action. (Defs.' Memorandum of Law, at 17-19.) Defendants further argue that, even if plaintiff is able to sustain a *prima facie* claim, his claim is nonetheless defeated by the defendants' showing that plaintiff would have been transferred regardless of the speech. (Defs.' Memorandum of Law, at 19.)

After careful consideration of the record under the applicable summary judgment standard, the Court finds that plaintiff is unable to establish a *prima facie* First

Amendment retaliation claim as a matter of law. Specifically, the Court concludes that the speech at issue is not protected by the First Amendment because plaintiff did not speak as a citizen. Moreover, even assuming *arguendo* that a portion of plaintiff's May 2004 memorandum to Commissioner Dormer was speech as a citizen on a matter of public concern, a causal relationship between that speech and an adverse action cannot be established as a matter of law.[5] With respect to this issue, plaintiff fails to raise a sufficient inference of causation because (1) too long of a time gap exists between the 2004 memorandum and any possible adverse action, and (2) intervening causal events occurred between the 2004 memorandum and the alleged retaliation. In short, there is no factual evidence that the 2004 memorandum, which was only sent to Commissioner Dormer, played any role in the alleged adverse actions or had any influence on the decision to transfer plaintiff – a decision that was made over two years later by individuals other than Commissioner Dormer. Accordingly, the Court grants defendants' motion for summary judgment on the First Amendment claim and discusses the bases for doing so in turn.

---

[5] The Court need not decide, therefore, whether plaintiff can survive summary judgment on the remaining elements of a First Amendment retaliation claim, including whether plaintiff's speech involved a matter of public concern. Furthermore, because the Court finds that plaintiff's *prima facie* case is deficient as a matter of law, the Court does not address defendants' assertion that they would have taken the same adverse action regardless of plaintiff's speech. Defendants do not argue that the harm caused by plaintiff's expression outweighed its value in a *Pickering* test, which the Court also does not reach in this decision.

### A. Speech as a Citizen

As the Second Circuit recently emphasized, "[i]t is established law in this Circuit that, '[r]egardless of the factual context, we have required a plaintiff alleging retaliation to establish speech protected by the First Amendment.'" *Sousa v. Roque,* No. 07-1892-cv, – F.3d –, 2009 WL 2568949, at *4 (2d Cir. Aug. 21, 2009) (quoting *Williams v. Town of Greenburgh*, 535 F.3d 71, 76 (2d Cir. 2008)). More specifically, "[t]o determine whether or not a plaintiff's speech is protected, a court must begin by asking 'whether the employee spoke as a citizen on a matter of public concern.'" *Sousa*, 2009 WL 2568949, at *4 (quoting *Garcetti v. Ceballos*, 547 U.S. 410, 418 (2006)). It is critical to note that this test contains two separate requirements – namely, (1) that the employee speak as a citizen, and (2) that the employee speak on a matter of public concern. If either of these requirements are not met, then plaintiff's First Amendment retaliation claim must fail as a matter of law. *See Sousa*, 2009 WL 2568949, at *4 ("If the court determines that the plaintiff either did not speak as a citizen or did not speak on a matter of public concern, 'the employee has no First Amendment cause of action based on his or her employer's reaction to the speech.'") (quoting *Garcetti*, 547 U.S. at 418).[6]

---

[6] In *Sousa*, the Second Circuit reiterated, on the issue of whether the speech addresses a matter of public concern, that "a speaker's motive is not dispositive in determining whether his or her speech addresses a matter of public concern." 2009 WL 2568949, at *8. Thus, the Court held that "the District Court erred in its determination in this case that Sousa's speech did not address a matter of public concern because he was motivated by his employment grievances." *Id*. Instead, "[w]hether or not speech addresses a

In *Garcetti v. Ceballos*, 547 U.S. 410 (2006), the United States Supreme Court clarified the threshold inquiry for a First Amendment retaliation claim in the public employment context. To determine whether the speech at issue is constitutionally protected, the court must first decide whether the plaintiff was speaking as a "citizen," rather than as a public employee. *Id.* at 421. "If the answer is 'no,' then no First Amendment claim arises, and that ends the matter." *Caraccilo v. The Village of Seneca Falls, N.Y.*, 582 F. Supp. 2d 390, 405 (W.D.N.Y. 2008). In *Garcetti*, the Supreme Court explained that

> [r]estricting speech that owes its existence to a public employee's professional responsibilities does not infringe any liberties the employee might have enjoyed as a private citizen. It simply reflects the exercise of employer control over what the employer itself has commissioned or created.

547 U.S. at 421-22. By expressly holding that speech pursuant to a public employee's

official duties is not insulated from employer discipline, *Garcetti* emphasized the dual nature of the threshold inquiry into the status of speech; it first directs a court's attention to the role that the speaker occupied, requiring that "before asking whether the subject-matter of particular speech is a topic of public concern, the court must decide whether the plaintiff was speaking 'as a citizen' or as part of [his] public job." *Mills v. City of Evansville*, 452 F.3d 646, 647 (7th Cir. 2006); *see also Weintraub v. Bd. of Educ. of City of N.Y.*, 489 F. Supp. 2d 209, 214 (E.D.N.Y. 2007) (noting that *Garcetti* made clear that, in addition to the "public concern" element, there is a "new and independent element of a claim of First Amendment retaliation – that the public employee's speech was made in the employee's capacity as a private citizen rather than as an employee, a criterion that is never satisfied when the employee speech at issue was made pursuant to the employee's official duties."); *Benvenisti v. City of N.Y.,* No. 04 Civ. 3166 (JGK), 2006 WL 2777274, at *7 (S.D.N.Y. Sept. 23, 2006) ("First, the Court must determine whether the plaintiff was speaking as a 'citizen' for First Amendment purposes. After that, the Court must turn to the traditional [*Connick v. Myers*, 461 U.S. 138 (1983)] analysis and ask whether, viewing the record as a whole and based on the content, context, and form of a given statement, the plaintiff's speech was made as a citizen upon 'matters of public concern.'") (internal citations omitted).

*Garcetti*, however, did not "articulate a comprehensive framework for defining the scope of an employee's duties in cases where there is room for serious debate." 547 U.S. at 424. In that case, there was no dispute that the plaintiff, a deputy district attorney and calendar deputy with certain supervisory responsibilities over other lawyers, wrote the

_____

matter of public concern 'must be determined by the content, form, and context of a given statement, as revealed by the whole record, and while motive surely may be one factor in making this determination, it is not, standing alone, dispositive or conclusive." *Id.* (quotations and citations omitted). However, as noted above, this Court need not address the "matter of public concern" requirement in the instant case because the undisputed facts demonstrate as a matter of law that plaintiff was not speaking as a citizen, but rather as an employee pursuant to his official duties, in connection with the speech at issue in the instant case.

memorandum at issue, which recommended dismissal of a case based on misrepresentations found in an affidavit, pursuant to his employment duties. *Id.* at 421; *accord Posey v. Lake Pend Oreille Sch. Dist. No. 84*, 546 F.3d 1121, 1127 (9th Cir. 2008). Although the Supreme Court did not set forth specific criteria for determining when speech is made pursuant to an employee's officials duties, it instructed that the inquiry "is a practical one[,]" because "the listing of a given task in an employee's written job description is neither necessary nor sufficient to demonstrate that conducting the task is within the scope of the employee's professional duties for First Amendment purposes." *Garcetti*, 547 U.S. at 424-25. It also noted that speech by a public employee retains some possibility of First Amendment protection when it "is the kind of activity engaged in by citizens who do *not* work for the government." *Id.* at 423 (emphasis added). To illustrate its point by way of comparison, *Garcetti* "also list[ed] examples of prototypical protected speech by public employees, namely 'mak[ing] a public statement, discuss[ing] politics with a coworker, writ[ing] a letter to newspapers or legislators, or otherwise speak[ing] as a citizen.'" *Davis v. McKinney*, 518 F.3d 304, 311 (5th Cir. 2008) (quoting *Spiegla v. Hull*, 481 F.3d 961, 967 (7th Cir. 2007)).

Since *Garcetti*, some lower courts have developed more guidelines for determining whether speech is made pursuant to a public employee's official duties. Although none of the following factors are dispositive, they may be considered by the Court: the plaintiff's job description; the persons to whom the speech was directed; and whether the speech resulted from special knowledge gained through the plaintiff's employment. *See Caraccilo*, 582 F. Supp. 2d at 405. As indicated by *Garcetti*,

two relevant factors that, considered in isolation, are not dispositive are whether the speech occurs in the workplace and whether the speech concerns the subject matter of the employee's job. *See* 547 U.S. at 420-21; *accord Abdur-Rahman v. Walker*, 567 F.3d 1278, 1282 (11th Cir. 2009). Again, in general, "[a]lthough there is no simple checklist or formula by which to determine whether the employee was speaking as a private citizen or as a public employee . . . 'the cases distinguish between speech that is the kind of activity engaged in by citizens who do not work for the government and activities undertaken in the course of performing one's job.'" *Caraccilo*, 582 F. Supp. 2d at 410 (quoting *Davis*, 518 F.3d at 312-13) (additional quotation marks and citation omitted).

As set forth below, after careful consideration of the underlying undisputed facts, the Court concludes that plaintiff's speech at issue in this case was made in his capacity as a Highway Patrol officer, not as a citizen.[7] Consequently, plaintiff's speech

_____

[7] To the extent that it is unclear whether this issue is a question of law for the Court or a mixed question of law and fact in part for a factfinder, that uncertainty does not impact the analysis herein. *Compare, e.g.*, *Caraccilo*, 582 F. Supp. 2d at 412 (stating that the issue is ultimately a matter of law but that underlying factual issues preclude summary judgment) *with Mulcahey v. Mulrenan*, No. 06 Civ. 4371 (LBS), 2008 WL 110949, at *4 (S.D.N.Y. Jan. 3, 2008) (following the guidance in *Connick v. Meyers,* 461 U.S. 138, 148 n.7 (1983), that "the inquiry into the protected status of speech is one of law, not fact"); *see generally Posey*, 546 F.3d at 1127-29 (discussing the split among circuit courts as to whether this issue is one of law (as determined by the Fifth, Tenth, and D.C. Circuits) or one of mixed law and fact (as determined by the Third, Seventh, Eighth, and Ninth Circuits)).

does not fall within the ambit of First Amendment protection.

First, it is undisputed that the subject matter of plaintiff's speech related to his employment. In fact, it was more than just *related*; rather, one of plaintiff's core job functions was to enforce the VTL by issuing traffic summonses, and his statements solely concerned the enforcement of the VTL through issuances of traffic summonses to off-duty law enforcement personnel and PBA cardholders.

Second, plaintiff made his speech internally within the SCPD. The statements made verbally during the May 2004 and January 2006 meetings were directed to the supervisors who were present at the meetings, and the 2004 memorandum was addressed to Commissioner Dormer, as someone higher up the chain of command than those supervisors who threatened to discipline plaintiff during the May 2004 meeting. There is no indication that plaintiff spoke to anyone outside the SCPD with respect to the SCPD's enforcement of the VTL or alleged lack thereof. *See, e.g., Healy v. City of N.Y. Dep't of Sanitation*, 286 Fed. Appx. 744, 746 (2d Cir. June 30, 2008) (affirming summary judgment for defendant and holding that report of corruption was made within scope of official duties where, *inter alia*, the plaintiff uncovered the corruption while performing an assigned task and there was no evidence of

external communications).

Third, plaintiff made the statements in the course of duty as a police officer. The 2004 memorandum, in particular, was written on a standard internal correspondence form and references a "department wide e-mail" sent by Commissioner Dormer on the issue. (*See* Gatto Decl., Ex. C.) There is no evidence, or even an allegation, that plaintiff spoke while he was outside of his work premises or during his off-duty hours on his own personal time.

Fourth, the speech reflected his special knowledge about the situation gained as a Highway Patrol officer. *See Williams v. Dallas Indep. Sch. Dist.*, 480 F.3d 689, 694 (5th Cir. 2007). Specifically, Brady spoke about his own ticketing practices with respect to PBA cardholders and off-duty personnel and about the alleged practices of other officers in the SCPD, based on what he observed or learned from the job.

Finally, plaintiff's speech was reactive, made only in response to discipline or threatened discipline, and only pursued to the extent that his job security was at issue. "Indeed, the *circumstances* of speech can sometimes be more indicative of its official or nonofficial nature than the *content* of such speech." *Baranowski v. Waters*, No. 05-1379, 2008 WL 4000406, at *20 (W.D. Pa. Aug. 25, 2008) (emphasis in original). Here, plaintiff only made the allegedly protected statements during the 2004 meeting in response to "numerous complaints that had been received relating to [plaintiff's] issuance of tickets to law enforcement individuals or individuals with PBA cards." (Brady Aff. ¶ 3.) It was only after this meeting, when plaintiff left feeling as though he might be disciplined and transferred, that he wrote the May 2004 memorandum to Dormer, the

---

Here, plaintiff conceded at oral argument (and the Court agrees) that the issue of whether plaintiff spoke as a citizen or a public employee is a matter of law for the Court in this case because no factual disputes exist regarding the underlying content of Brady's speech, his job responsibilities, or the other factors relevant to the question of whether he spoke as a citizen or an employee.

entirety of which – with the exception of one sentence invoking the public's safety – discussed the merits of his own work performance and vindication thereof. (*See* Gatto Decl., Ex. C.) With respect to the 2004 memorandum, the thorough analysis of the court in *Sweeney v. Leone*, No. 3:05 Civ. 871 (PCD), 2006 WL 2246372 (D. Conn. 2006) is persuasive. At issue in *Sweeney* were statements made by a police officer to his supervisors while on duty at a dispatch center. The court there stated:

> Plaintiff was on duty at the dispatch center when he was involved in the discussions with his supervisors. The comments at issue requested help pursuant to an e-mail sent by Chief of Police DiVenere to the Bristol Police Department on November 29. According to Plaintiff's deposition testimony, he acted upon this email when he called for extra help due to the increased call volume on December 2. The context and content of Plaintiff's requests clearly demonstrate that they were work requests made pursuant to official departmental policy, following the Chief of Police's November 29 e-mail. Plaintiff was not speaking "as a citizen;" instead, his requests for assistance related to his "daily professional activities," which included ensuring that all incoming calls to the dispatch center were answered.

*Id.* at *9 (footnote and internal citations omitted). In this case, plaintiff indicated in his 2004 memorandum that he was seeking the assistance of Dormer because of a "department wide e-mail" that Dormer had previously sent. (*See* Gatto Decl., Ex. C.) In addition, plaintiff's subsequent actions reveal that he did not follow-up with the requests in his 2004 memorandum, even though they apparently went unaddressed, once it became clear that he was not disciplined or transferred following the May 2004 meeting and/or memorandum. In fact, plaintiff did not pursue his speech any further until December of 2005, as discussed *infra*. As in *Sweeney*, therefore, the context and content of plaintiff's request confirm that plaintiff was speaking pursuant to his daily professional activities when he engaged in this internal correspondence activity. As for the statements made at the January 2006 meeting, plaintiff concedes that the meeting was called in response to an e-mail that plaintiff wrote pursuant to his official duties in December of 2005, and again, plaintiff did no more than express his views regarding a "cut-off" point at which off-duty officers and individuals with PBA cards should be ticketed. (Brady Aff. ¶ 8.). In short, the circumstances surrounding plaintiff's speech plainly indicate that the speech, in all three instances, related to his work performance and his position within the Highway Patrol Bureau.

Again, the Court recognizes that none of the aforementioned factors, including the motivation by the plaintiff in engaging in the speech, is dispositive. *See, e.g., Caracillo*, 582 F. Supp. 2d at 412 ("[T]he fact that plaintiff's speech to these officials may have *related* in some way to her job is not dispositive of whether it was made *pursuant* to her job duties or that it was unprotected[.]") (emphasis in original); *Davis*, 518 F.3d at 313

14

n.3 ("We recognize that it is not dispositive that a public employee's statements are made internally."). However, taken together, all of these undisputed facts paint a clear picture of an employee speaking out about his views regarding how best to perform his job duties, rather than of someone attempting to make a "contribution[] to the civic discourse." *Garcetti*, 547 U.S. at 422. Far from resembling anything close to "activity engaged in by citizens who do not work for the government[,]" *id*. at 423, plaintiff's speech was rather "a means to fulfill his employment requirements." *Renken v. Gregory*, 541 F.3d 769, 774 (7th Cir. 2008). Accordingly, under the particular circumstances of this case, the speech is not properly subject to the protections of the First Amendment. *Cf., e.g.*, *Caraccilo*, 582 F. Supp. 2d at 411 (finding that speech was made as a public employee where the speech was directed at other members of the local government and concerned matters relating to the plaintiff's job duties, and distinguishing that speech from an affidavit that plaintiff signed in connection with a citizen's Article 78 proceeding, which was found to be speech made as a citizen).

Stated another way, where plaintiff spoke on these occasions – including the May 2004 meeting, the May 2004 memorandum, and the January 2006 meeting – about his enforcement of the VTL, such speech is not protected because "there is no relevant analogue to speech by citizens who are not government employees." *Garcetti*, 547 U.S. at 424; *accord Baranowski*, 2008 WL 4000406, at *20 (concluding that where a police officer internally relayed his misgivings about an investigation to his supervisors, there was no analogue to citizen speech). The one statement by plaintiff in the record that could have been uttered by a private citizen is the following: "I believe the situation on the roadways of Suffolk County is quite frankly out of control and the public's safety is at risk due to the fact that there are so many individuals who believe that they are immune to being ticketed or arrested for any traffic offense they commit." (Gatto Decl., Ex. C.) However, for reasons discussed in more detail *infra*, this one sentence is not enough to convert speech in this case that, in light of the entire record, is clearly made as a public employee into speech as a private citizen that warrants protection under the First Amendment. *See Abdur-Rahman*, 567 F.3d at 1283 ("Instead, to determine whether a statement receives First Amendment protection . . . we look to the content, form, and context of a given statement, as revealed by the whole record.") (internal quotation marks, alterations, and citation omitted). In other words, a mere reference to public safety by a police officer in connection with internal statements to a supervisor that clearly relate to his official duties in the enforcement of the traffic laws does not magically transform such speech into speech by a private citizen. To hold otherwise would improperly conflate the "matter of public concern" requirement with the "private citizen" requirement, even though both the Supreme Court and Second Circuit have made clear that the two issues must be analyzed separately.

Following *Garcetti*, several courts within this Circuit have reached the same conclusion as this Court under similar circumstances. For example, in *Mulcahey v. Mulrenan*, No. 06 Civ. 4371 (LBS), 2008 WL 110949 (S.D.N.Y. Jan. 3, 2008), a fireman expressed to his superiors that he did not feel comfortable serving as an acting battalion chief in violation of union policy and directives. *See id*. at *2. Plaintiff made oral complaints and also wrote a memorandum to the chief of

operations, stating that he was acting without proper training and "under protest." *Id.* Judge Sand held that the plaintiff's actions fell "squarely within the boundaries of *Garcetti*." *Id.* at *4. The court reasoned that the plaintiff's memorandum reflected individualized concerns regarding plaintiff's request for an exemption for his duties. *See id.* at *6. There, the plaintiff's job duties included protecting himself, his fellow firefighters, and members of the public from danger, and thus his speech to his supervisor concerning his belief that performing his duties as acting battalion chief would have a negative impact on his unit – and possibly on the public – was made pursuant to his official duties. *See id.* The court further rejected the plaintiff's argument that his job description did not require him to voice his concern, as the Supreme Court expressly stated in *Garcetti* that job descriptions are not dispositive of whether a duty is official. *See id.* Instead, Judge Sand explained that "it is logical to conclude that verbalizing an inability to perform official duties is, itself, an official duty." *Id.* Likewise, in this case, plaintiff's speech reflected individualized concerns, embodied in his effort to defend his practice of ticketing individuals with PBA cards and off-duty law enforcement personnel, and thereby avoid a threatened transfer and vindicate his enforcement efforts.

In *Mulcahey*, Judge Sand relied in part on Judge Koeltl's analysis in *Benvenisti v. City of New York,* No. 04 Civ. 3166 (JGK), 2006 WL 2777274 (S.D.N.Y. Sept. 23, 2006). In *Benvenisti*, the plaintiff was a computer operations manager for the City of New York, who was responsible for managing the City's information security. *See id.* at *2. The plaintiff had lodged complaints to his supervisor and other supervisors at formal status meetings, concerning the alleged negative impact of the performance of one of the defendant's nephews on the workplace's productivity, efficiency, functionality, and morale. *See id.* at *3. The plaintiff also indicated that he planned to complain formally to the New York City Council, the Conflict of Interest Board, or the Public Advocates Office, but was discharged before he could do so. *See id.* The latter speech was conceded by the defendants to go beyond the parameters of plaintiff's job duties. *See id.* at *8. With respect to the weekly complaints to his supervisors, however, the court held that "[v]iewing the evidence as a whole, it is clear that the plaintiff's weekly complaints to his supervisors were made pursuant to his official duties" because they "involved precisely the sorts of internal office affairs and employment matters that the plaintiff – as a manager and supervisor – had a duty to address." *Id.* at *9.

Similarly, in *Brewster v. The City of Poughkeepsie,* 434 F. Supp. 2d 155 (S.D.N.Y. 2006), Judge McMahon held that a police officer's speech regarding the dismissal of traffic tickets did not satisfy the private citizen requirement. In particular, the plaintiff in *Brewster* was a civilian parking enforcement agent who claimed that she was retaliated against for her husband's criticism of the police chief's decision to dismiss two pending traffic summonses issued by her husband, who was a police officer. *See id.* at 156. Officer Brewster (by counsel) had written a letter to the chief and deputy chief of police, voicing his objections to the dismissals of the tickets. *See id.* at 156-57. He further complained to the District Attorney's office and requested that they investigate the matter. *See id.* Judge McMahon held these facts were analogous to those in *Garcetti*, stating that Officer Brewster's "speech related to his supervisor's decision to dismiss two pending traffic summonses he had issued" and "[l]ike

Ceballos' memo [in *Garcetti*] expressing his position on the proper disposition of a pending criminal case, Officer Brewster's letters to the Chief and Deputy Chief of Police and to the District Attorney related to his 'daily professional activities,' which included determining whether sufficient evidence existed to prosecute pending traffic tickets." *Id.* at 156-57 (quoting *Garcetti*, 547 U.S. at 422).

In the instant case, as in *Brewster*, plaintiff's speech related to his "daily professional activities," specifically his practice of issuing traffic summonses to certain individuals. Plaintiff concedes that the May 2004 meeting was called in response to a complaint by Webb after he had been issued a ticket by plaintiff. At the meeting, plaintiff voiced his frustrations about certain individuals' attempts to get out of tickets that plaintiff, according to the law and his job description, had the authority to issue. The May 2004 memorandum further addresses this same subject matter, namely, plaintiff's reasons for ticketing these individuals and, more generally, how his enforcement actions reflect the merits of his work performance. Plaintiff's statements during the January 2006 meeting are even further afield from the ambit of First Amendment protection under *Garcetti*, since the determination of a cut-off speed limit for ticketing individuals is clearly a necessary first step in issuing such tickets. The invocation of the public's safety in passing does nothing to change this analysis. As noted *supra*, not only is the question of whether the topic is a matter of public concern a wholly separate inquiry that should not be conflated with the inquiry at hand, accepting plaintiff's position that his reference to highway safety makes his speech akin to that of a public advocate (as contended by plaintiff's counsel at oral argument) would

transform every highway patrol officer's comments on how he should perform his job into a constitutional grievance. Indeed, many aspects of a police officer's job duties, and those of many other public employees, directly impact issues important to the citizenry; simply mentioning this potential impact is not enough, by itself, to turn employees' internal disputes with their superiors about official matters into First Amendment claims. Such a result would completely undermine the *Garcetti* framework. *Cf. Almontaser v. N.Y. City Dep't of Educ.*, No. 07 Civ. 10444 (SHS), 2009 WL 2762699, at *4 (S.D.N.Y. Sept. 1, 2009) ("Here, the parties agree that [plaintiff's] duties include speaking with the press; thus, the only question is whether [plaintiff] can carve out a portion of her statements made during an interview that was arranged and supervised by her employer as the protected speech of a private citizen. When that entire interview owes its existence to [plaintiff's] official responsibility to interact with the press on behalf of [the school], then the individual statements made within the conversation also fall within her official – and thus unprotected – speech.").

In an effort to support his position, plaintiff directed this Court's attention during oral argument to *Wallace v. Suffolk County Police Dep't*, No. 04 Civ. 2599 (JS) (WDW), slip op. (E.D.N.Y. Feb. 5, 2007). The Court, however, finds *Wallace* distinguishable. In that case, the plaintiff, a Suffolk County police officer, complained about internal police department conduct that went beyond his core job functions. There, the plaintiff complained to various supervisors that the report documenting his injury, which he sustained in the line of duty, was inaccurate and forged. *See id.* at 3-4. He also raised issues concerning insufficient training and

improper equipment and also requested an investigation into a possible "cover-up" of the incident that resulted in his injury. *See id.* at 5. The plaintiff in *Wallace* went so far as to complain to the police department's internal affairs bureau and also filed a complaint with the Suffolk County District Attorney's office regarding these issues. *See id.* at 7. Judge Seybert accordingly held that *Garcetti* was not controlling because plaintiff's complaints concerned broader allegations of improper training and procedural violations that went beyond any official duty of plaintiff as a police officer. *See id.* at 15. The plaintiff in that case also did not dispute that, in contrast to these broader allegations, the report that he wrote when he got injured on the job was completed pursuant to his official duties. *See id.* In the instant case, unlike in *Wallace*, plaintiff's speech related to his core job functions and he never made any statements outside the internal meetings and communications within the SCPD regarding disagreements about his enforcement of the traffic code.[8]

---

[8] The Court's own research of cases in which a police officer made internal complaints about matters related to his employment has revealed that, where such claims have survived summary judgment, the complaints were broader, in terms of content unrelated to the officer's specific job duties and/or to whom such speech is directed, than that made by plaintiff in this case. For example, in *Drolett v. DeMarco*, No. 3-05 Civ. 1335 (JCH), 2007 WL 1851102 (D. Conn. June 26, 2007), a police sergeant sent an anonymous letter to four of the five members of the police commission, the town's First Selectman, and a local newspaper, alleging that favorable treatment for some officers resulted in an uneven distribution of training, manpower, assignments, and use of department funds. *See id.* at *2-3. As in *Wallace*, the court found that complaining anonymously to the police commission about

In addition to the district court cases in the Second Circuit discussed above, this Court's determination in this case is consistent with the rulings of other circuit courts that have expounded on *Garcetti*. For example, the Ninth Circuit has included in its test whether or not the speech was a product of "'perform[ing] the tasks [the employee] was paid to perform'" *Freitag v. Ayers*, 468 F.3d 528, 544 (9th Cir. 2006) (quoting *Garcetti*, 547 U.S. at 422). As discussed *supra*, plaintiff's speech was certainly the product of performing his paid duty of highway patrol. These cases are also "consistent in holding that when a public employee raises complaints or concerns up the chain of command at his workplace about his job duties, that speech is undertaken in the course of performing his job[,]" which is also what occurred in this case. *Davis*, 518 F.3d at 313 (collecting cases) (citations omitted); *see also Thompson v. District of Columbia*, 530 F.3d 914, 916 (D.C. Cir. 2008) ("Ordinarily, employees who make recommendations to their supervisors on subjects directly related to their jobs are carrying out their official duties and thus receive no First Amendment protection."); *Freitag*, 468 F.3d at 545-46 (holding that a prison guard who informed her state Senator and Inspector General about sexual harassment at work was speaking as a citizen, but that her internal reports of inmate sexual misconduct and documentation of the prison's failure to respond were not protected by the First Amendment). The Tenth Circuit has gone so far as to summarize the cases as "hav[ing] made clear that speech relating to tasks within an employee's uncontested

staffing, mismanagement, and budgetary issues were not clearly part of plaintiff's ordinary or "core" job duties and, thus, the claim survived summary judgment. *See id.* at *5.

employment responsibilities is not protected from regulation. This may be true even though the speech concerns an unusual aspect of an employee's job that is not part of his everyday functions. Indeed, we have stated that speech is made pursuant to official duties if it is generally consistent with 'the type of activities [the employee] was paid to do.'" *Brammer-Hoelter v. Twin Peaks Charter Academy*, 492 F.3d 1192, 1203 (10th Cir. 2007) (internal citations omitted). Of course, plaintiff's speech would meet a significantly stricter standard, since his speech directly addressed a basic aspect of his job, which was a part of the everyday functions that he was paid to do.[9]

A case outside of this Circuit that is strikingly similar to the case at hand is *Mills v. City of Evansville, Indiana*, 452 F.3d 646 (7th Cir. 2006), which came before the Seventh Circuit Court of Appeals. In *Mills*, the plaintiff was a sergeant with responsibilities that included supervising crime prevention officers ("CPOs"). *Id*. at 647. After a meeting on departmental premises at which the chief described a plan to reallocate CPOs in order to deal with a manpower shortage, Mills discussed the subject in the lobby of the building with other supervisors. *See id*. She argued that the plan would not work and "[o]thers present at the event got the impression that Mills would try to enlist community organizations against the plan rather than describe its virtues." *Id*. A supervisor then placed a "Summary of Counseling" letter in her file, and Mills was reassigned to other duties. *See id*. Judge Easterbrook concluded the following:

> Mills was on duty, in uniform, and engaged in discussion with her superiors, all of whom had just emerged from Chief Gulledge's briefing. She spoke in her capacity as a public employee contributing to the formation and execution of official policy. Under *Garcetti* her employer could draw inferences from her statements about whether she would zealously implement the Chief's plans or try to undermine them; when the department drew the latter inference it was free to act accordingly.

*Id*. at 648.

In yet another case with parallel facts to the one at hand, a Trooper with the Pennsylvania State Police alleged that he was retaliated against for his speech in filing a claim against other officers for violations of,

<hr />

[9] Other cases also acknowledge, however, when speech by a public employee is more likely to exhibit the features of speech by a citizen. In this vein, "[t]he general principle running through these and other cases applying *Garcetti* to similar situations is that, when a public employee airs a complaint or grievance, or expresses concern about misconduct, to his or her immediate supervisor or pursuant to a clear duty to report imposed by law or employer policy, he or she is speaking as an employee and not as a citizen; in such cases, the First Amendment does not protect the employee's speech from discipline or retaliation by the employer . . . . If, however, the employee goes outside of the established institutional channels in order to express a complaint or concern, the employee is speaking as a citizen, and the speech is protected by the First Amendment." *Weintraub*, 489 F. Supp. 2d at 219 (footnote and citation omitted). As stated *supra*, plaintiff in this case did not seek outside channels to air his complaints.

*inter alia*, the state vehicle code and that citing another officer for speeding constituted protected speech. *See Jendrzejewski v. Watson*, No. 3:2008-69, 2009 WL 789887, at *1-2 (W.D. Pa. Mar. 24, 2009). The plaintiff claimed that he was retaliated against for pursuing uniform application of the law toward all citizens, including law enforcement. *Id*. at *1. In rejecting the claim, the court reasoned that

> the [p]laintiff's reporting of violations of law and regulations by [the police department] employees was in furtherance of his duty as a member of the [police department]. There is no allegation that he uttered reports of these occurrences to the press or to the public outside of the [police department], rather, he uttered reports of these matters through a complaint with the [police] and by issuance of a traffic citation in accordance with his duty as a police officer. The [p]laintiff alleges that he was not compelled to make these statements "as a matter of official duty", but nevertheless, he did make them in furtherance of his role as a [] Trooper, not as a concerned citizen conducting independent investigations of how the [police department] disciplines violations of regulations and laws committed by its own employees.

*Id.* at *2; *see also Guthrie v. Bradley*, Civil Action No. 06-0619, 2008 WL 4279805, at *12-13 (W.D. Pa. Sept. 15, 2009) (finding speech not protected where the plaintiff reported, to the district attorney and FBI, "orders" that he had received to "fix" tickets, and explaining that "the court concludes that plaintiff's expressive conduct in response to orders to 'fix' tickets was pursuant to his duties as the chief of police, and is not protected under the First Amendment. Because the court finds that all plaintiff's expressive activities were in conformity with his official responsibilities, First Amendment protection is not available, and summary judgment will be granted in favor of defendants with respect to these claims.").

The Court is persuaded by the reasoning in *Mills* and the other above-referenced cases. In the instant case, as in *Mills*, plaintiff was on duty when he engaged in discussion with his superiors about his execution of SCPD policy on ticketing off-duty personnel and PBA cardholders. Only a favorable and very liberal construal of his speech would characterize it as a contribution to the formation and execution of an official policy, and even this construal is rejected under *Mills* as being protected speech under these circumstances. Plaintiff's employer, as in *Mills*, drew inferences that plaintiff would have trouble implementing the SCPD's policy of, *inter alia*, using appropriate discretion in ticketing such individuals and about whether he would zealously implement his superior's directives or try to undermine them and impose his own. As in *Jendrzejewski*, plaintiff's speech against unfair application of the VTL was in furtherance of his duty as a member of the Highway Patrol Bureau. He did not voice any of these complaints to the press or to anyone outside of the SCPD. In fact, he did not make these statements at all until he was called into a meeting specifically aimed at discussing his

enforcement practices, and he did not pursue the speech any further than needed to secure his job security. In sum, the undisputed evidence demonstrates that the plaintiff's speech was focused on how to implement his official job duties, in the face of conflict with his employer.

Indeed, the gravamen of plaintiff's opposition to the summary judgment motion is that plaintiff was not *required* by his job to make the statements that he did. Essentially, plaintiff argues that his job duty was merely to enforce the VTL, and he was not required to argue with his supervisors as to how to do so or write any letter to the commissioner. To the extent that plaintiff asserts that he was not required to make the statements at issue pursuant to his official duties, the Court rejects such a contention. First, plaintiff concedes that it was a primary function of his job to enforce the VTL by issuing traffic summonses. He was thus paid to perform this task, his speech arose out of performance of this task, and the speech addressed the implementation of this task and was made in an effort to facilitate it. If in the course of properly implementing his duties, he had to speak to his supervisors, such speech is still made in the course of his official duties. *See, e.g.*, *Brammer-Hoelter*, 492 F.3d at 1203 ("[I]f an employee engages in speech during the course of performing an official duty and the speech reasonably contributes to or facilitates the employee's performance of the official duty, the speech is made pursuant to the employee's official duties.").

At its core, plaintiff's argument relies upon an artificial distinction that the Court rejects. It is only because plaintiff's supervisors disapproved or disagreed with plaintiff's performance of his official task that plaintiff found himself defending his method

of enforcement – and thus having to speak about it. In doing so, he did not suddenly become an advocate for the public, and creative descriptions of plaintiff's speech cannot hide the fact that it was made in furtherance of his paid job duties. The D.C. Circuit has addressed this issue in detail:

> When employees make recommendations to supervisors on subjects directly related to their jobs, they are speaking as employees even if the supervisors discourage this speech. In *Green v. Board of County Commissioners*, 472 F.3d 794 (10th Cir. 2007), a lab technician alleged her bosses retaliated against her for disregarding their instructions and sending samples for outside testing. The Tenth Circuit explained the First Amendment did not protect the employee from discipline because "[h]er disagreement with her supervisors' evaluation of the need for a formal testing policy, and her unauthorized obtaining of the confirmation test to prove her point, inescapably invoke *Garcetti*'s admonishment that government employee's First Amendment rights do 'not invest them with a right to perform their jobs however they see fit.'" *Id.* at 801 (quoting *Garcetti*, 547 U.S. at 422, 126 S.Ct. 1951). Similarly, in *McGee v. Public Water Supply*, 471 F.3d 918

(8th Cir. 2006), an employee alleged his boss fired him for speaking out about a project's non-compliance with environmental standards. The Eighth Circuit held his speech was part of his job responsibilities, and thus not protected by the First Amendment, even though his supervisor had already removed him from the project and told him not to worry about any environmental problems. *Id*. at 921.

In this case, Thompson began his investigations when he was Chief of Security . . . . He claims at least some of his subsequent investigations were outside of his job duties, largely because his supervisors shuffled him among various security and auditor positions . . . . Thompson's argument is no different from that rejected in *Green* and *McGee* . . . . As our sister circuits recognized in *Green* and *McGee*, it would be incongruous to interpret *Garcetti*, a case concerned with allowing the government to control its employees within their jobs, as giving broader protections to disobedient employees who decide they know better than their bosses how to perform their duties.

*Thompson*, 530 F.3d at 917-18. This Court agrees with the above analysis and finds that plaintiff's speech, even favorably construed, is effectively speech about why plaintiff's enforcement policy is better than the one he perceived to be enforced by his superiors. Because the speech boils down to a disagreement that plaintiff had with supervisors regarding the performance of his official duty to ticket certain speeding motorists, that speech "cannot reasonably be divorced from [plaintiff's official] responsibilities." *Abdur-Rahman*, 567 F.3d at 1283; *see also Jendrzejewski*, 2009 WL 789887, at *2 ("The [p]laintiff alleges that he was not compelled to make these statements 'as a matter of official duty', but nevertheless, he did make them in furtherance of his role as a [] Trooper, not as a concerned citizen conducting independent investigations of how the [police department] disciplines violations of regulations and laws committed by its own employees.").

Second, even if the statements were not an explicit requirement of plaintiff's job, such would not automatically render the speech protected. As Judge Sand did in *Mulcahey*, the Court also rejects plaintiff's argument that his job description did not require him to voice his concern, since the Supreme Court expressly stated in *Garcetti* that job descriptions are not dispositive of whether a duty is official. *See Mulcahey*, 2008 WL 110949, at *6. Even in cases with facts far closer than those in this case, courts have emphasized that "focus[ing] on 'core' job functions is too narrow after *Garcetti*, which asked only whether an 'employee's expressions [were] made pursuant to official responsibilities.'" *Spiegla*, 481 F.3d at 966 (quoting *Garcetti*, 547 U.S. at 424). The inquiry is a practical one, and the Court has considered various factors and the entire record in making its determination, precisely because a mere assessment of plaintiff's job description would be an incomplete analysis. As stated by the Eleventh Circuit in rejecting

a plaintiff's position that there is a distinction between the speech in *Garcetti* and one where speech is not literally mandated by a job's requirements, "[o]ur precedents require that we reject [that] distinction . . . . We review the content, form, and context of a given statement, as revealed by the whole record, not whether an employee's job mandated the act of speaking, as revealed by facts considered in isolation. We have consistently discredited narrow, rigid descriptions of official duties urged upon us to support an inference that public employees spoke as private citizens." *Abdur-Rahman*, 567 F.3d at 1283 (collecting cases) (citations, alteration, and quotation marks omitted).

Finally, in reaching the conclusion that plaintiff's speech is not protected by the First Amendment based upon the undisputed facts of this case, the Court emphasizes that it is cognizant of the difficulty of drawing the line between protected and unprotected speech made by public employees. Certainly issues regarding enforcement of the traffic laws are likely to be specially within the knowledge of those patrolling the highways, and the potential contribution to the public discourse by someone in plaintiff's situation may be valuable. However, the Court is not concluding that any policy (if it exists) that provides preferential treatment to off-duty law enforcement officers and persons in possession of PBA cards does not impact public safety, nor is the Court concluding that such a matter is not of public concern. In other words, the analysis herein is in no way dependent on whether the alleged underlying policy is a matter of public concern or on the wisdom of any such policy from a law enforcement standpoint, as the first issue is not reached in this case and the latter is not a matter for the courts. Instead, the Supreme Court has already considered and weighed the various factors that uniquely affect the public employee First Amendment context, in which employees' speech and the goals of the employers often come into conflict. *See Garcetti*, 547 U.S. at 418. Indeed, "[i]n defining the protection afforded public employee speech, the Supreme Court has been sensitive to the 'public's interest in receiving the well-informed views of government employees engaging in civic discussion.'" *Benvenisti*, 2006 WL 2777274, at *7 (quoting *Garcetti*, 547 U.S. at 419); *accord Ruotolo v. City of N.Y.* 514 F.3d 184, 189 (2d Cir. 2008). The Supreme Court explicitly acknowledged that "[e]xposing governmental inefficiency and misconduct is a matter of considerable significance[,]" and public employers should be "receptive to constructive criticism offered by their employees." *Garcetti*, 547 U.S. at 425 (internal quotation marks and citation omitted). Thus, despite the difficulty of drawing the line between protected and unprotected speech by public employees, in the end, the Supreme Court has drawn that line at statements made pursuant to official duties, which are not to be protected under the First Amendment. Accordingly, the framework established by *Garcetti* as applied to this case means that plaintiff cannot constitutionalize his dispute with his supervisors – even if it touches on a matter of public concern – into a First Amendment claim because, given the undisputed facts and the circumstances of this particular case, his statements were made pursuant to his official duties. Of course, this ruling is case-specific and speech by a police officer against any such policy under other circumstances (not present here) could qualify for First Amendment protection.

In sum, the Court determines that all of the speech at issue – namely, the statements made by plaintiff during the May 2004

meeting and the January 2006 meeting, as well as the 2004 memorandum – was made by plaintiff pursuant to his official duties and is, thus, not subject to the protections of the First Amendment. However, there is also an alternative basis for the grant of summary judgment in this case as it relates to the 2004 memorandum, since a sufficient causal connection between the speech and an adverse action is lacking as a matter of law. As discussed below, even assuming *arguendo* that a portion of the 2004 memorandum – that is, the one sentence expressing to the police commissioner plaintiff's concern about the safety of the roads – could be considered speech made by plaintiff as a citizen about a matter of public concern, plaintiff's claim would fail because no adverse action is alleged to have occurred until at least eighteen months later and there is no evidence from which a rational jury could conclude that the transfer was caused by that speech.

B. Causal Connection

As part of plaintiff's *prima facie* First Amendment retaliation claim, plaintiff must demonstrate a "'causal connection . . . sufficient to warrant the inference that the protected speech was a substantial motivating factor in the adverse employment action.'" *Cotarelo v. Sleepy Hollow Police Dep't*, 460 F.3d 247, 251 (2d Cir. 2006) (quoting *Blum v. Schlegel*, 18 F.3d 1005, 1010 (2d Cir. 1994)). This causal connection can be demonstrated by plaintiff "indirectly 'by showing that the protected activity was followed by adverse treatment in employment, or directly by evidence of retaliatory animus.'" *Cobb v. Pozzi*, 363 F.3d 89, 108 (2d Cir. 2003) (quoting *Morris v. Lindau*, 196 F.3d 102, 110 (2d Cir. 1999)). Furthermore, "a plaintiff may not rely on conclusory assertions of retaliatory motive to satisfy the causal link. Instead he

must produce 'some tangible proof to demonstrate that his version of what occurred was not imaginary.'" *Cobb*, 363 F .3d at 108 (quoting *Morris*, 196 F.3d at 111) (alteration omitted). "Summary judgment is precluded where questions regarding an employer's motive predominate in the inquiry regarding how important a role the protected speech played in the adverse employment decision." *Morris*, 196 F.3d at 110.

"In this Circuit, an inference of causation is defeated (1) if the allegedly retaliatory discharge took place at a temporal remove from the protected activity; or (2) if there was an intervening causal event that occurred between the protected activity and the allegedly retaliatory discharge." *Tasadfoy v. Ruggiero*, 365 F. Supp. 2d 542, 551 (S.D.N.Y. 2005) (citation omitted). As set forth below, in the instant case, the undisputed facts demonstrate that there is no temporal inference of causation and there was a clear intervening causal event that led to the transfer, such that plaintiff's retaliation claim based on the 2004 memorandum lacks evidence of causation that can survive summary judgment.[10]

---

[10] For the purpose of deciding whether the speech was a "motivating factor" in plaintiff's transfer, the Court assumes *arguendo* that this speech was protected by the First Amendment and that plaintiff suffered from an adverse employment action, namely, the monitoring of plaintiff by his supervisors from January to June 2006 and his transfer to the precinct in July 2006. Based on the evidence submitted by the parties, as well as questions posed to counsel during oral argument, it is apparent that plaintiff does not argue that any adverse actions occurred prior to 2006. Plaintiff points out that certain defendants made threats of discipline that occurred on the same day as the allegedly protected speech on May 19, 2004; however, there is no evidence that any threats of

First, eighteen months passed between the 2004 memorandum and any counseling sessions plaintiff had following the January 2006 meeting. Over two years passed between the 2004 memorandum and the recommendation for plaintiff's transfer in June 2006. "Three months is on the outer edge of what courts in this circuit recognize as sufficiently proximate to admit of an inference of causation." *Tasadfoy*, 365 F. Supp. 2d. at 551. At oral argument, plaintiff's counsel admitted that "pretty much nothing" happened in the time frame between May 19, 2004 and the January 2006 meeting and failed to identify any evidence or legal authority that could support the claim surviving summary judgment on the issue of causation.

Of course, the Court recognizes that the Second Circuit "has not drawn a bright line to define the outer limits beyond which a temporal relationship is too attenuated to establish a causal relationship between the exercise of a federal constitutional right and an allegedly retaliatory action," *Gorman-Bakos v. Cornell Coop. Extension*, 252 F.3d 545, 554 (2d Cir. 2001), and courts must carefully consider the time lapse in light of the entire record. *See, e.g.*, *Grant v. Bethlehem Steel Corp.*, 622 F.2d 43, 45-46 (2d Cir. 1980) (holding eight-month gap between EEOC complaint and retaliatory action suggested a causal relationship); *see also Richardson v. N.Y.S. Dep't of Corr. Servs.*, 180 F.3d 426, 446-47 (2d Cir. 1999), *abrogated on other grounds by Burlington N. & Santa Fe Railway Co. v. White*, 548 U.S. 53

(2006) (holding abusive acts within one month of receipt of deposition notices may be retaliation for initiation of lawsuit more than one year earlier). Here, plaintiff has failed to set forth any evidence that the 2004 memorandum resulted in any adverse action. There is no evidence in the record that any of the defendants, including Commissioner Dormer, received or even read plaintiff's memorandum. There is circumstantial evidence that someone in the Commissioner's office received the letter because the deputy commissioner called plaintiff shortly thereafter at his home while plaintiff was on vacation. (Brady Dep., at 51.) However, when asked what the deputy commissioner said to him during that phone call, plaintiff testified to the following:

> A. We went over a few things, but my general impression of the man was that he was a very nice individual. We never really got into any specifics about what was going to be done or whatever.
>
> Q. Did he say anything about your request to have a camera installed in your police car?
>
> A. I don't believe that ever came up, no. It's been a long time but I don't remember that coming up.

(Brady Dep., at 51-52.) After this phone call, plaintiff did not suffer from any adverse action for at least eighteen months and does not argue otherwise. No video camera was ever installed in plaintiff's police car, despite plaintiff's request for this "solution" in his memorandum. At no point thereafter did plaintiff follow-up with the correspondence to

---

discipline occurred in response to the 2004 memorandum (as opposed to the statements made during the May 2004 meeting). In fact, the reverse is true; plaintiff claims that he wrote the 2004 memorandum *in response to* the threats of discipline made during the May 2004 meeting.

Commissioner Dormer. Plaintiff was transferred on the recommendation of Palmieri and Mulligan in June 2006, over two years after the date of the 2004 memorandum, and there is no evidence that either Palmieri or Mulligan was aware of the 2004 memorandum or based their transfer recommendation, in whole or in part, on it. Under these circumstances, no causal link can be inferred by a reasonable jury. *See Morris*, 196 F.3d at 113 ("No showing was made that defendants were even aware of his support for Pavone. Further, since two years elapsed between Morris' letter of support for Pavone and his discharge, no inference of causation is justified.").

In any event, plaintiff's own concession that the January 2006 meeting was called in response to an e-mail written by plaintiff, pursuant to his official job duties, constitutes an uncontroverted, intervening causal event that defeats plaintiff's claim based on the 2004 memorandum. The undisputed evidence shows that plaintiff's supervisors did not take any further action against plaintiff until receipt of the December 2005 e-mail, which plaintiff sent on his own initiative. A meeting was called to address plaintiff's questions in that e-mail in January 2006, and plaintiff's comments regarding his ticketing practices resulted in his subsequent counseling sessions and eventually his transfer. In short, there is simply no evidence that the 2004 memorandum led to the transfer. No reasonable juror could reach such a conclusion given the following uncontroverted intervening events in the record: plaintiff's authoring the December 2005 e-mail; the January 2006 meeting; Palmieri's examination of plaintiff's traffic summonses during March 2006; plaintiff's comments in the March 30, 2006 Counseling Session Form, and the comparison of plaintiff's traffic summonses between February 17, 2006 and June 16, 2006 with that of two other Highway Patrol officers.

In sum, plaintiff has failed to provide any evidence of causation to support a *prima facie* case on his claim that the 2004 memorandum may have been a "motivating factor" in the potentially adverse actions he was subjected to in 2006. Accordingly, even assuming *arguendo* that the 2004 memorandum constituted First Amendment speech, plaintiff's claim for First Amendment retaliation based on his memorandum to Commissioner Dormer fails as a matter of law.

## V. CONCLUSION

For the foregoing reasons, the Court grants defendants' motion for summary judgment with respect to plaintiff's First Amendment retaliation claim, which is the only remaining claim pending in this case. Accordingly, the complaint is dismissed in its entirety, and the Clerk of the Court shall enter judgment for the defendants and close this case.


SO ORDERED.


_____
JOSEPH F. BIANCO
United States District Judge

Dated: September 18, 2009
Central Islip, New York

* * *

Plaintiff is represented by Rick Ostrove, Esq., Matthew Scott Porges, Esq., and Thomas Ricotta, Esq. of Leeds Morelli &

Brown, P.C., One Old Country Road, Suite 347, Carle Place, New York 11514. Defendants are represented by Chris P. Termini, Esq., and Christopher M. Gatto, Esq. of the Suffolk County Attorney's Office, 100 Veterans Memorial Highway, Hauppauge, New York 11788.